UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division

56TH STREET INVESTORS, INC.,

and

WAYNE D. FRANKLIN,                                    ACTION NO. 4:13cv149

      Plaintiffs,

v.

WORTHINGTON CYLINDERS MISSISSIPPI, LLC,

      Defendant.

### *MEMORANDUM OPINION AND ORDER*

This matter is before the Court to resolve claims arising from the alleged breach of an asset purchase agreement. Following a two day bench trial, the parties supplemented the proposed findings of facts and conclusions of law submitted to the Court before trial and the matter is now ripe for adjudication. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court's findings of facts and conclusions of law are set forth below. For the reasons set forth below, the Court concludes plaintiffs have failed to establish a breach of contract and/or failed to establish damages resulting from any such breach.

## I.      BACKGROUND AND PROCEDURAL HISTORY

**A.      The Second Amended Complaint and Damages Sought by Plaintiffs**

On September 30, 2013, plaintiffs, 56th Street Investors, Inc. ("56th Street"), and Wayne Franklin ("Franklin"), filed a civil action in the Circuit Court for the City of Hampton against defendant, Worthington Cylinders Mississippi, LLC ("Worthington"). ECF No. 1-1. On

November 8, 2013, Worthington removed the action to this Court, pursuant to 28 U.S.C. §§ 1332, 1441, 1446. ECF No. 1. Following the Court's ruling on Worthington's motion for a more definite statement, ECF Nos. 3, 5, plaintiffs filed an amended complaint on December 17, 2013. ECF No. 6. On January 6, 2014, Worthington simultaneously filed an answer to the complaint and moved to dismiss plaintiffs' request for $900,000.00 in punitive damages. ECF Nos. 6-9. On April 16, 2014, the Court granted Worthington's motion and dismissed plaintiffs' request for punitive damages due to plaintiffs' noncompliance with the Local Rules and their failure to allege: (1) a tort independent of the breach of contract claims at the heart of plaintiffs' complaint; (2) facts sufficient to support a claim for gross negligence; and (3) facts showing that defendants engaged in reckless or intentional misconduct motivated by malice or ill will. ECF No. 14.

Prior to the original trial date of September 3, 2014, plaintiffs moved to continue the trial and add a defendant, Doral Corporation ("Doral"). ECF No. 22. After the Court granted this motion, plaintiffs filed a second amended complaint against both Worthington and Doral on August 29, 2014. ECF No. 24. Plaintiffs and Doral subsequently reached a settlement involving any claims against Doral and dismissed Doral from the case on August 19, 2015. ECF No. 46. As a result of this settlement, plaintiff also dismissed all claims against Worthington for damage to concrete flooring contained in count two. *Id.*

The second amended complaint alleges that plaintiff Franklin and Hy-Mark Cylinders, Inc. ("Hy-Mark"), entered into a contract with Worthington, specifically, an asset purchase agreement, whereby Worthington agreed to purchase the business and assets of Hy-Mark. ECF No. 24 at ¶ 3. Hy-Mark, the complaint alleges, conducted its manufacturing business from a building located in Hampton, VA, owned by plaintiff 56th Street. *Id.* at ¶¶ 1-2. Both Hy-Mark and 56th Street were

solely owned by plaintiff Franklin.  *Id.*  Plaintiffs allege that Worthington, in removing Hy-Mark's manufacturing equipment and assets pursuant to the contract, breached the contract by damaging 56th Street's building during such removal, failing to repair such damage, failing to remove certain items specified for removal under the contract, and improperly removing other items not subject to removal under the contract.  *Id.* at ¶¶ 11, 27, 31, 35

Although styled in six counts, each count of the second amended complaint seeks a different element of damages allegedly stemming from Worthington's failure to abide by the contract.  Plaintiffs seek:  (1) $421,386.90 based upon the estimated cost of repairing alleged damages to the electrical systems in the building (count one); (2) miscellaneous costs associated with roofing, wall, and plumbing repairs (count two); (3) $900.00 for the cost of replacing fire extinguishers and fire suppression equipment allegedly removed by Worthington (count three); (4) $31,790.46 for the cost of cleanup services necessitated by Worthington's alleged failure to clean the building (count four); (5) "at least $250,000[.00]" in lost rental income stemming from the fact that, due to the alleged damage to the electrical systems, the building could only be rented for simple storage, rather than as a manufacturing facility (count five); and (6) $3,700.00 for the cost of estimates needed to assess and identify any necessary repairs (count six).  *Id.*  The *ad damnum* clause of the second amended complaint seeks "actual damages of $785,927.36, plus interest and costs . . . ."[1]  *Id.* at ¶ 45.

---

[1] To account for plaintiffs' settlement with Doral and their dismissal of count two's claim for damages to concrete flooring against Worthington, this sum must be reduced by approximately $78,150.00.  *See* ECF No. 46.

**B.      The Pretrial Dispute over Plaintiffs' Expert Witnesses**

Before trial, Worthington moved to exclude the testimony of plaintiffs' experts[2] due to plaintiffs' failure to provide a written report from such experts in accordance with Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure.   ECF No. 15.   Plaintiffs opposed the motion arguing that the experts in question, including Thomas Waltz of Campana Waltz Real Estate and Gary Hewitt of Hewitt Construction Company, were not specially retained as experts, but instead were involved in the dispute prior to the onset of litigation, and thus were not required to disclose written and signed expert reports.   ECF No. 17 (citing Fed. R. Civ. P. 26(a)(2)(B)).   Further, plaintiffs argued that they had complied with Fed. R. Civ. P. 26(a)(2)(C) by disclosing, with respect to such experts, the subject matter of their expected testimony and summaries of the facts and opinions upon which they relied.   ECF No. 17 at 8.

The exhibits appended to the parties' filings revealed plaintiffs' discovery responses and disclosures in this regard.   Exhibit B to plaintiffs' opposition to Worthington's motion, for example, contained a set of itemized proposals prepared by Gary Hewitt "for labor and materials for the replacement of [electrical] components starting at the closest termination point from the equipment back to the original power source" for the building from which Worthington removed Hy-Mark's equipment.   ECF No. 17-B.   These same proposals were also attached as Exhibit A to the original and second amended complaint.

Exhibit 1 to Worthington's motion to exclude also included plaintiffs' responses to Worthington's interrogatories and document requests.   ECF No. 16-1.   In these documents, plaintiffs notified Worthington about, among other things, Thomas Waltz's efforts to rent or sell

---

[2] Although the motion to exclude addressed five persons identified by plaintiffs as experts, plaintiffs called only two of these experts to testify at trial.

the Hy-Mark facility following the sale and removal of the equipment from it.   ECF No. 16-1 at 6-9 (identifying renters, leases, lessees, and listing price of $2,950,000.00).   In response to an interrogatory, plaintiffs identified Thomas Waltz as an "expert in building values for lease and sale" and specified that he would testify about "the reduction in value of the Premises for sale or rent due to damages caused by Defendant, efforts to sell and lease the Premises, and the causes for reduction in rent."   ECF No. 16-1 at 13.   In this regard, in response to an interrogatory asking plaintiff 56th Street Investors (the building owner) to state with particularity its damages, 56th Street identified the cost of repairs identified in repair estimate prepared by Gary Hewitt and the "lost rents described in Plaintiffs' Complaint . . . ."   *Id.* at 15.   In response to the same interrogatory, plaintiff Franklin reported that he, as 56th Street's sole owner, likewise "suffered all of the losses incurred by 56th Street . . . through reduction in value of his assets, loss of income from 56th Street . . . , and expenses incurred . . . in repairing the damage."   *Id.* at 15-16.

With respect to Thomas Waltz's testimony, plaintiffs disclosed to Worthington assorted documents pertaining to Waltz's effort to sell Hy-Mark's building (for $2,950,000.00) or lease it (55,000 square feet at $5.25 per square foot), information about the marketing methods to be employed, maps/photographs of the facility, and several leases for the facility.   ECF No. 18–3. Neither the interrogatory responses nor the document production by plaintiffs contained any information concerning any records or opinions by Mr. Waltz regarding the reduction in the overall value of the premises as a result of any damages to the facility allegedly caused by Worthington.

After a hearing on the motion to exclude on July 21, 2014, ECF No. 21, the Court granted the motion in part and denied it in part.   With respect to witnesses Hewitt and Waltz, the Court

ruled that, to the extent that they became involved in the matter prior to litigation and provided services to plaintiffs pertaining to repair estimates and marketing and leasing the property, they were not specially retained and need not have prepared signed, written expert reports. ECF No. 20 at 2. Accordingly, the Court ruled that Gary Hewitt could testify about his repair estimates and opinions related thereto. *Id.* With respect to Thomas Waltz, the Court ruled, consistent with the damages alleged in the complaint and the disclosures identified as exhibits to the filings concerning the motion to exclude, he "may testify to the fair market value of the lease and the value obtained when a portion of the property was re-let." *Id.* The Court also ruled that plaintiffs would not be allowed to elicit expert testimony from their experts "regarding [Worthington]'s responsibility for the alleged damage as it relates to the Sales Agreement, or the duties of the departing occupant of the building" because to do so would "render them specially retained . . . and trigger the reporting requirements" of Rule 26(a)(2)(B), with which plaintiffs previously failed to comply. *Id.* at 3. Finally, the Court permitted plaintiffs to remedy any shortcomings in their prior disclosures pertaining to their experts by means of allowing additional disclosures and by extending and modifying the expert disclosure deadline. *Id.*

## C.     Worthington's Motion for Summary Judgment

On November 23, 2015, the Court held a final pretrial conference with counsel for the parties in advance of the bench trial set for December 15, 2015. ECF No. 48. In the final pretrial order dated November 23, 2015, plaintiffs' list of exhibits specified that they sought to introduce building leases and marketing materials consistent with those documents discussed above. ECF No. 49 at 3. In plaintiffs' factual contentions, they claimed that due to the damages allegedly caused by Worthington, plaintiffs "had difficulty renting the Building to others." *Id.* at ¶ 29.

6

Plaintiffs further alleged that, due to Worthington's removal of the building's existing heavy duty electrical wiring and components, they were unable to rent the building at "the highest rental levels" and instead were forced to rent the building "at a significantly reduced rate," resulting in estimated rental losses of $250,000.00. *Id.* at ¶¶ 30-31. Plaintiffs' presented no factual contentions regarding the sale of the building or the reduction in total value of the building as a result of the damages allegedly caused by Worthington.

One day before trial, Worthington filed a motion for summary judgment advising that defense counsel's independent research revealed that 56th Street had sold the building on October 6, 2015 for $2,700,000.00. ECF No. 56 at 2. Exhibit A to Worthington's motion contained a deed, signed by plaintiff Franklin on behalf of 56th Street, conveying the premises to a buyer on October 6, 2015. ECF No. 56-A at 2-4. Worthington's motion reported that plaintiffs had neither disclosed the sale to Worthington nor supplemented any prior discovery. ECF No. 56 at 2; Trial Transcript ("Trial Tr.") 282-83. These nondisclosures were later corroborated by plaintiffs' counsel, who informed the Court at trial that he was unaware of the sale until the day before trial, and by Wayne Franklin, who testified at trial that he did think the sale of the property was "relevant."[3] Trial Tr. 90-92, 97-98.

Worthington sought summary judgment on two grounds. First, it argued that, assuming any breach of contract had occurred, plaintiffs were now unable to prove they suffered any damages resulting therefrom with respect to count one. Worthington argued that the recent,

---

[3] On the basis of the expert witness disclosures, the Court's prior ruling in that regard, the damages theory alleged in the second amended complaint (lost rent), and the failure of plaintiffs to timely disclose the sale of the property to Worthington and the Court, the Court precluded plaintiffs from eliciting testimony at trial from Thomas Waltz regarding the alleged diminution in the total value of the premises allegedly resulting from Worthington's damage to the electrical systems. Trial Tr. 269-78.

undisclosed sale of the property and plaintiffs' failure to actually undertake any of the repairs proposed by Gary Hewitt, limited plaintiffs' basis for recovering damages to proof of the diminution, if any, of the market value of the property stemming from the alleged contract breach. ECF No. 56 at 3-6.   Inasmuch as plaintiffs failed to disclose any such proof to the defense in advance of trial and were in no position to present evidence of any diminution in market value at trial, Worthington argued it was entitled to summary judgment upon count one as a matter of law. *Id.*   Second, to the extent that plaintiffs' proposed findings of fact and conclusions of law filed on December 9, 2015 sought to raise new statutory causes of action and recovery against Worthington based upon Virginia law, Worthington sought entry of summary judgment upon them because plaintiffs failed to plead such claims in the complaint.   *Id.* at 6.   Given the late nature of Worthington's filing, the Court, in a telephone conference held on December 14, 2015, reserved ruling on the motion for summary judgment and rejected plaintiffs' request for postponement of the trial, which proceeded as scheduled on December 15-16, 2015.

## II.     FINDINGS OF FACT

**A.     Stipulated Findings of Fact**

In the final pretrial order, the parties stipulated to the following facts.   *See* ECF No. 49 at ¶¶ 1-7.

1.     Plaintiff, 56th Street Investors, Inc. ("56th Street"), is a Delaware corporation that owned the property at 305 E Street in Hampton, VA (the "building" or "premises").

2.     Plaintiff Wayne D. Franklin ("Franklin") is a Virginia resident and the sole shareholder of 56th Street.

3.     Defendant Worthington Cylinders Mississippi, LLC ("Worthington"), is an Ohio

limited liability company.

4.      Hy-Mark Cylinders, Inc. ("Hy-Mark"), was a cylinder manufacturing business, of which plaintiff Franklin was a shareholder, and that was formerly located at the premises.

5.      On or about May 21, 2010, Franklin and Hy-Mark entered into an asset purchase agreement (the "contract") with Worthington.

6.      Worthington hired Doral Corporation ("Doral") to provide rigging and transportation services in connection with moving the purchased assets.

7.      56th Street has not restored or replaced all of the electrical panels, wiring, conduit, or other electrical items that it claims were improperly removed from the premises.

**B.      The Contract**

The Court makes the following additional findings of fact set forth below.

8.      According to the contract, Hy-Mark was "engaged in the business of manufacturing and selling cylinders and other products, including . . . impact extruding cylinders and other products for the medical, recreation, and general industries and also performing secondary processing on certain products such as machining, necking, heat treating, painting, coatings, and assembly . . . ."  Plaintiff's Exhibit ("Pl. Ex.") 1 at ¶ A.

9.      Hy-Mark engaged in this business in a warehouse of approximately 55,000 square feet located upon a roughly seven acre site within an industrial park located in Hampton, VA.  Pl. Ex. 23.

10.      Worthington agreed to buy "substantially all of the assets" of Hy-Mark's business for the sum of $8,000,000.00, plus sums to compensate the seller for certain capital and other expenditures and for the value of the seller's product inventory at the time of closing, set to take

place on June 21, 2010.   Pl. Ex. 1 at ¶¶ 1.3, 2.1.

11.     The assets purchased by Worthington included "all of the assets of [Hy-Mark], including without limitation, the following assets, properties, and rights of [Hy-Mark] used directly or indirectly in the conduct of, generated by, held, or constituting" Hy-Mark's business: (a) "assets and properties reflected on the Interim Balance Sheet[4]" or acquired thereafter, other than receivables or inventory sold after the date of said balance sheet, in the ordinary course of business; (b) intellectual property belonging to or used in the course of Hy-Mark's business; (c) "[a]ll machinery, equipment, tools, dies, furniture, furnishings, fixtures, goods and other tangible property"; (d) "[a]ll inventory including . . . work in progress, parts, components, . . . raw materials, labels, office and other supplies, merchandise and other inventories"; (e) "[a]ll motor vehicles"; (f) "customer and supplier lists"; and (g) goodwill.  Pl. Ex. 1 at ¶ 1.1.1(a)-(j); Pl. Ex. 19.

12.     The assets purchased included:  office equipment, furniture, tools, dies, forklifts, compressors, industrial saws, industrial sanders, industrial presses, grinders, dryers, conveyers, cylinder rinse stations, and assorted other assets contained in Hy-Mark's manufacturing warehouse.  *Id.*

13.     The contract specified that the assets purchased did not include, among other things, "[t]he land, building, and improvements which make up the Business Property."   Pl. Ex. 1 at ¶ 1.1.2(b).

14.     To facilitate Worthington's removal of the purchased assets from the premises, the contract specified that Hy-Mark and Franklin (due to his control of 56th Street – the owner of the

---

[4] No party offered this exhibit into evidence at trial.

10

premises) would provide Worthington "full access to the Business Property to remove the Purchased Assets . . . ."  Pl. Ex. 1 at ¶ 7.11.2.

15.     Hy-Mark and Franklin agreed to keep the purchased assets at the premises for a period of 10 months and 27 days following the closing and Worthington agreed to pay Franklin (or 56th Street) $18,000.00 per month and $16,000.00 for the final 27 days for Worthington's access to the premises during removal operations.   Pl. Ex. 1 at ¶ 7.11.

16.     To facilitate removal of the purchased assets, the contract authorized Worthington to hire third-parties (identified as a "Removal Party"), such as the Doral Corporation, "to dismantle and ship the equipment to" Worthington.   Pl. Ex. 1 at ¶ 7.11.1(b); Pl. Ex. 14; Trial Tr. 190.

17.     Worthington agreed "to use reasonable care in removal of the equipment so as not to cause any unnecessary damage to the building . . . [, to] repair and be responsible for any damage caused by [Worthington] or its agents and leave the Building in the condition it was prior to the equipment removal."   Pl. Ex. 1 at ¶ 7.11.1(c).

18.     This responsibility, however, did not extend to "restoring the Building to the condition it was prior to the installation of the equipment or for correcting conditions" not caused by Worthington.   *Id.*   In this regard, the contract specified that Worthington "shall have no liability to fill in pits, remove mounting bolts or supports from the floor, remove pipes, conduit, electrical wire or services, level the floor, etc."   *Id.*

19.      The contract contained a merger clause, specifying that its terms superseded any prior written or oral agreements or understandings, and also specified that the contract "shall not

be amended or modified except by written instrument duly executed by each of the parties hereto." Pl. Ex. 1 at ¶ 10.2.

20.     The contract also contained a provision regarding waivers and specified that "[n]either any failure nor any delay by any party in exercising any right, power, or privilege under this Agreement . . . will operate as a waiver of such right, power or privilege . . . ."  Pl. Ex. 1 at ¶ 10.4.   In this regard, the contract further provided that "[t]o the maximum extent permitted by applicable law, . . . no claim or right arising out of this Agreement can be discharged by one party, in whole or in part, by waiver or renunciation of the claim or right unless in writing signed by the other party entitled to the benefit of such claim or right . . . ."  *Id.*

21.     The contract specified that it "shall be governed in all respects, including validity, interpretation and effect, by the internal laws of the State of Ohio without regard to the principles of conflict of laws thereof."   Pl. Ex. 1 at ¶ 10.9.

## C.     Wiring and Electrical Systems (Count One)

22.     In or about 1983, plaintiff 56th Street acquired the building located at 305 E Street, Hampton, VA, which, at the time, had some wiring suitable for "pretty heavy electrical" use. Trial Tr. 22.   Between approximately 1990 and 1995, 56th Street rented the premises to a plating manufacturer, which added to the existing electrical systems.   Trial Tr. 23-25.

23.     In or about 2000 or 2001, plaintiff Franklin decided to go into the cylinder manufacturing business, formed Hy-Mark, and operated it from 305 E Street, Hampton, VA. Trial Tr. 22.

24.     As Hy-Mark introduced various machinery and equipment to the facility, it added electrical wiring and components ("electrical systems") to power those machines and Eastern

12

Management, another firm operated by plaintiff Franklin, paid for acquiring and installing most of these electrical systems.   Trial Tr. 23-24.   Substantial additions to the building's electrical systems were made over time following the formation of Hy-Mark.   Plaintiff Franklin estimated that, when purchased by 56th Street, the building contained approximately 10 to 25% of the electrical systems later present at the time of the closing on the asset purchase agreement in June 2010.   Trial Tr. 99-100.

25.     At the time of the closing, the premises contained dozens of pieces of machinery and equipment, powered by electricity, which were located throughout the premises.   Defendant's Exhibit ("Def. Ex. 7").   Due to the industrial nature of the machinery, it could not simply be plugged into a wall socket.   Pl. Ex. 26A at 22.   In conjunction with the piecemeal addition of machinery to the site over time, Hy-Mark ran wiring from the main power source or main breaker panel to other electrical components (such as fusible disconnects[5], transformers[6], other breaker panels independent of the main, soft starters[7], or to control boxes[8]) and ultimately to the machinery being installed.   Pl. Ex. 26A at 22, 34-36; Trial Tr. 22-23, 153.   The wiring from the main power source traveled either directly to the machinery in question or indirectly by means of the other intermediate electrical components noted above.   This was accomplished by means of wiring

_____

[5] A fusible disconnect is a device used to connect and disconnect power to a machine, which has a lever on the side that when moved up or down correspondingly moves blades that "actually move the power into the fuse connectors."   Pl. Ex. 26A at 27.

[6] Hy-Mark made use of step-down transformers to "step down a voltage," for example, from the 480 voltage in the plant to a lower voltage, thereby lowering the power that is directed to a particular piece of machinery operating at a different voltage.   Pl. Ex. 26A at 28-39; Trial Tr. 366.

[7] A soft starter is kind of clutch or device designed to protect and to assist in starting a motorized piece of machinery.   Trial Tr. 31.

[8] A control box is a device associated with a particular piece of machinery, which is located on the machinery itself or on a nearby wall, containing assorted components for the machinery, such as motor starters, push buttons, switches, and the like.   Pl. Ex. 26A at 42-43.

and/or by the use of steel conduit containing such wiring, both of which snaked either along walls or through the exposed facility ceiling joists until arriving adjacent to or above the machinery needing electricity for operation.   Pl. Ex. 26A at 26, 34-36; Trial Tr. 305-06.

26.   Shortly after the closing on the asset purchase agreement, plaintiff Franklin and Jody McKinley, a senior project engineer for Worthington and its team leader on the asset relocation, met at the site and discussed how the machinery would be disconnected from the electrical systems.   Trial Tr. 31.   During this discussion, Franklin testified that he proposed Worthington disconnect at the closest disconnect box, which he described as often being the motor located on the machine, or, if the machine possessed a soft starter, at the entrance to the soft starter. Trial Tr. 31-32, 38-39.   McKinley remembered the same discussion differently.   He testified that, while he and Franklin were conducting the walk-through, Franklin proposed that Worthington simply cut the wire along the walls and ceiling and leave it dangling.   Trial Tr. 202. McKinley rejected this proposal as unsafe and presenting an electrical hazard for anyone working at the site.   Trial Tr. 202, 312-14.   Instead, he told Franklin that the wiring should be removed back to the nearest, safest disconnect and testified that Franklin not only acceded to this request, but also never objected it.[9]   Trial Tr. 203.

27.   McKinley further elaborated that the location of the nearest, safest disconnect varied for each piece of machinery, depending upon whether the machinery was connected to intermediate electronic components or to the main electrical panel and also upon whether any

---

[9] McKinley testified about this conversation when called in plaintiffs' case-in-chief and also when called in the defendant's case-in-chief.   When first asked, McKinley indicated simply that Franklin did not object to his proposal.   Trial Tr. 203.   On the second and third occasions, McKinley stated that, in response to his proposal, Franklin nodded his head and said "okay." Trial Tr. 313-14, 356.

intermediate electrical device were in good working order.   Trial Tr. 203.

28.     The Court credits McKinley's testimony about this arrangement:   (1) because the work proceeded essentially in accordance with it over an extended period of time; (2) because the existence of the arrangement was corroborated by the testimony of other witnesses; (3) due to the absence of contemporaneous, substantial complaints from Franklin about the manner of the work; (4) due to Franklin's lengthy delay following the completion of the work in seeking a repair estimate; (5) the absence of any written record during or immediately after the work showing that Franklin complained to Worthington about the manner of the work; and (6) because, although Franklin's suggestion may have been highly unsafe, it may well have been easier for Worthington to adopt it and cut the wire and simply remove the equipment.

29.     The asset removal began immediately and occurred from June through December 2010.   While Franklin testified that he was "gone" for most of this time and, when "very rarely" present, worked in his office[10] and only occasionally "peeked outside," Trial Tr. 36, the Court finds he was present a sufficient number of times to have observed the ongoing asset removal work.   For example, Franklin was present when Worthington officials first came on site to start the work.   Trial Tr. 31-32.   Franklin was also present at least once during the ensuing two weeks, as testified to by Eric Hight, a longtime Hy-Mark employee who began working under contract to Worthington immediately following the closing.   Pl. Ex. 26A at 46; Trial Tr. 191.   Significantly, during this two week period, the disconnection and removal of machinery began promptly because, after two weeks, Hight traveled to Worthington's Mississippi plant to begin receiving and

---

[10] Franklin's office was located on the second floor of the premises and contained windows that looked out over the interior of the premises where the asset removal was occurring.   Trial Tr. 38; Pl. Ex. 26A at 20.

installing some of the removed machinery.   Pl. Ex. 26A at 45.

30.     Franklin's presence at the site was also confirmed by Melody Martin and Scott Anson, who both worked for Doral during the asset removal process.   Martin testified that she first saw Franklin "the first or second day we were there" and stated that thereafter "[h]e was on site quite a bit" until she ceased working at the premises in September 2010.   Def. Ex. 24 at 7, 18. Similarly, Scott Anson, Doral's site leader, testified that, during his work in the building from July through late December 2010, Franklin was there "a lot of times," and as late as the day after Thanksgiving, and that Franklin came out on the floor while the job was ongoing.   Trial Tr. 244, 249.

31.     Others present at the facility from June through December 2010, also confirmed that they received direction from Jody McKinley regarding the disconnection procedure consistent with the arrangement described by McKinley.   For example, Eric Hight stated that McKinley told him "to disconnect to the safest point or to [the] disconnect."   Pl. Ex. 26A at 70, 97.   Hight further testified that this varied from machine to machine and might in one case be a disconnection at the first panel or fusible disconnect or, in another instance, might be all the way back to the breaker panel.   *Id.* at 70-71, 97.   Hight also testified that, because "[l]ots of things were set up as cells," in order to remove some pieces of machinery, all the wiring and conduit linking the various pieces of equipment had to be disconnected prior to moving them.[11]   *Id.* at 41-44 (discussing

---

[11] A similar situation was encountered with respect to the purchased machinery located in the sanding room.   This room was enclosed to facilitate the collection of dust stemming from the use of the machinery and some of the electrical controls and power feeds to operate the machinery were located outside of the room.   Trial Tr. 326-28, 395-96.   Due to the size of the machinery, the enclosure, wiring, and conduit needed to be removed so that the purchased asset could be removed from the sanding room.   Trial Tr. 326-28, 395-96.   The disassembly of the room was discussed with Franklin and he raised no concerns regarding the removal of electrical systems

removal of transformers and disconnects associated with specific machinery), 46-47.

32.      Similarly, Scott Anson stated that "Joey" from Worthington (an apparent reference to Jody McKinley) told him to remove the wiring at "the safest point," which Anson determined by reference to be "[w]here you wouldn't have a bare wire hanging if somebody turned the power on."   Trial Tr. 231-32.   Anson further testified that, for approximately 70% of the machinery on the premises, the safest point of the disconnect was back to the main power supply to the building due to the absence of junction boxes, panels, or switches between the machinery and the main electric supply panel.   Trial Tr. 240-41.   Melody Martin confirmed this as well.   Def. Ex. 24 at 33.   Hight, Martin, and Anson's testimony was consistent with McKinley's testimony that the wiring throughout the premises varied but that over 50% of the machinery was wired, without intervening disconnects, directly from the main power ("direct feed from the main switchgear") to the machinery being powered.   Trial Tr. 305-06.

33.      As a result and mostly as depicted in plaintiffs' exhibits 3.1 - 3.8, 4.1 - 4.3, 6.1 - 6.6, and 7.1 - 7.7, assorted wiring, conduit, and electrical components were removed from the premises in the course of removing Hy-Mark's assets and machinery.[12]   The Court finds that the removal of these electrical systems was consistent with the arrangement agreed upon by Jody McKinley and Wayne Franklin.

---

attendant thereto.   Trial Tr. 326-28, 395-96.

[12] The testimony at trial established that not all of the photographs offered by plaintiffs depicted items that Worthington or its employees or agents removed from the premises.   Indeed, some photographs depicted conditions Worthington found upon arriving at the premises.   Trial Tr. 307-09.   For example, the Court finds that some of the photographs contained in plaintiffs' exhibit 5 series show markings of electrical systems previously removed by plaintiffs to minimize the risk of fire or explosion in the sanding room.   Pl. Ex. 26A at 31-32, 76-78; Def. Ex. 2 at W000034; Trial Tr. 295, 327-28, 349-50, 375-76, 396.

34.     Franklin denied that he ever sold, discussed or gave anyone permission to remove any electrical panels, conduit, or wiring.   Trial Tr. 32, 40-41.   He also stated that he observed such items being removed on just one occasion when he saw a Doral employee removing "some small wires" that were coiled on the floor.   Trial Tr. 37-38.   When Franklin told the employee that he was not supposed to do this, the employee told him that "Jody told me to move them," to which Franklin testified that he responded, "well, I'll have to take that up with Jody."   *Id.*   No evidence exists that Franklin spoke or wrote to Jody McKinley or Worthington about this incident, while the asset removal was ongoing.

35.     Due to his intermittent presence at the premises through until late November 2010, Franklin was in a position to witness the removal of electrical systems comprising part of or associated with the purchased assets.   Yet, rather than voicing or following up on complaints about such activity with Worthington, Franklin failed to act in the manner consistent with one having knowledge of what he now asserts constituted a breach of the asset purchase agreement. In spite of having contact with Jody McKinley, Scott Anson, and Melody Martin at the premises during the asset removal, Franklin voiced no complaints to them about the removal of electrical systems, with one exception noted below.[13]   Trial Tr. 203, 345 (McKinley:   Franklin never expressed any concerns to him about wiring and conduit removal); Trial Tr. 245 (Anson:

---

[13] There is evidence that Franklin made one complaint during the asset removal.   When his former employee Eric Hight returned to the premises after working in Mississippi, Franklin spoke to him about some wiring missing from a wall-mounted electrical panel that powered the lights to the back addition to the premises and an electronic security gate.   Pl. Ex. 26A at 49, 72.   This complaint was addressed and resolved by Worthington, when it sent and directed Eric Hight to address this repair.   Trial Tr. 358-59.   Significantly, although Franklin asked Hight at that time to take certain photographs of the premises, he did not ask that he photograph any of the areas pertaining to removed electrical systems.   Pl. Ex. 26A at 49.   Nor did he make any other complaints about the electrical systems.   *Id.*

18

Franklin never commented about missing wiring or conduit); Def. Ex. 24 at 18-19 (Martin: Franklin "never said anything negative" about the condition of the building or wiring). Franklin's failure to act serves as further proof that the arrangement described by McKinley existed.

36.     After Worthington left the premises in December 2010, Trial Tr. 328, Franklin testified that he called Jody McKinley "maybe in January, somewhere in 2011," to complain about the removal of wiring and they set up a meeting when McKinley would "come up" to discuss the matter, but he "never came up." Trial Tr. 41-42, 402-03. Further, although Franklin testified that thereafter he sent an email to McKinley seeking to talk about issues with "electrical and concrete," plaintiffs failed to present such a document at trial. Trial Tr. 402-03. When asked to explain why, after allegedly seeking and failing to obtain satisfaction from Worthington, he waited until November 2011 to obtain an independent estimate to repair the alleged damage to the building's electrical systems, Franklin candidly stated that he did not "have a good answer" and "didn't know why he waited that long." Trial Tr. 123. The Court finds that the absence of documentary evidence of timely complaints about any damage to the premises, along with plaintiffs' decision to wait eleven months before seeking a repair estimate, also buttresses the finding that the arrangement described by McKinley existed.

**D.      Miscellaneous Repairs (Count Two)**

37.     Although plaintiffs settled most of their claims in count two, certain miscellaneous items remained in dispute. Trial Tr. 119 (seeking cost of roof repairs, attachment of loose panel, and block repair). In a proposal dated October 21, 2011, Gary Hewitt estimated the cost of: (a) removing and repairing "13 existing abandoned roof penetrations[14]" and covering these openings

---

[14] The Court infers that these "existing penetrations" were made to facilitate the operation of

with metal, insulation, and rubber roofing at $6,500.00; (b) removing certain miscellaneous items in the roofing system including some loose conduit, plastic piping, and two pieces of angle iron at $1,500.00; (c) reattaching certain loose wall panels at $400.00; and (d) removing and painting an 8 x 8 x 16 block at $25.00.   Pl. Ex. 2.   Although Hewitt's trial testimony was not entirely clear, the Court finds Hewitt performed and was paid for the $6,500.00 roof repair and the $25.00 block repair.   Trial Tr. 181-83.

38.     Plaintiff Franklin also testified to finding damage, after Worthington's departure, associated with an exterior wall panel that was pushed away from where it met the base of the floor.   Trial Tr. 52, 76-78; Pl. Ex. 10.   Because Hewitt never indicated that he performed this repair, and because Franklin never indicated what he paid for any such repair and contradicted himself about whether he ever repaired the wall panel, Trial Tr. 113, the Court is unable to find that plaintiff incurred any costs for any such repair.

39.     The Court also finds that the evidence is insufficient to establish that plaintiffs paid a "couple thousand" to repair damage to a concrete block wall, as testified to by Franklin.   Trial Tr. 113, 117-18.   In this regard, plaintiffs again failed to submit any documentary evidence regarding who performed the work and proof of payment.   Additionally, the Court finds, notwithstanding the contrary testimony by Franklin, Trial Tr. 398-99, that the photographs of repaired concrete block walls (previously damaged during the asset removal) taken by McKinley in late December 2010, document repairs undertaken by Worthington or contractors on its behalf. Trial Tr. 183, 314, 328, 360-61; Def. Ex. 2 at W81; Pl. Ex. 10.1.

---

Hy-Mark's machinery prior to the asset purchase agreement.

**E.      Fire Suppression Equipment (Count Three)**

40.      When Worthington closed on the purchase of Hy-Mark's assets, the premises contained an unspecified number of fire extinguishers, at least one of which was hung on the wall. Trial Tr. 52-53; Pl. Ex. 5.6.   Franklin testified that 56th Street owned these fire extinguishers and that a third party maintained them.   Trial Tr. 52-53.   During the asset removal, Eric Hight called "the fire extinguisher company" (apparently the third party referred to by Franklin) and had them picked up by the company, reportedly because they contained "a hazardous gas and . . . needed to be removed."   Pl. Ex. 24A at 61-62.   Count three specifies that plaintiffs seek $900.00 to replace fire extinguishers and unspecified fire suppression equipment.   Because plaintiffs' presented no evidence at trial regarding their calculation or payment of such a sum, the Court is unable to find that they actually incurred any costs in replacing such items.

**F.      Building Cleanup and Removal of Assorted Materials (Count Four)**

41.      After Worthington arrived at the premises, it identified various hazardous materials and chemicals located throughout the facility.   Trial Tr. 316.   During a discussion between plaintiff Franklin and Worthington's McKinley, a storeroom was identified as a staging area for the disposition of such items.   Trial Tr. 316.   During this discussion, McKinley told Franklin, as well as his son, Jason Franklin, among others, that the disposition of "any and all chemicals related to the manufacturing process would be the responsibility of Worthington" and would be staged in one area of the storeroom.   Trial Tr. 316.   He further indicated that "any chemicals that were nonrelated to the manufacturing process would be staged in the opposite area of that storeroom." Trial Tr. 316.   The second set of materials included items such as household paints, roofing tar, containers of asphalt sealers, and other items Worthington identified as not associated with the

manufacturing process.    Trial Tr. 316-17, 324.    McKinley testified that plaintiffs were responsible for the disposition of the latter set of materials, while Worthington arranged and paid for the disposal of the former.    Trial Tr. 324, 346-47.

42.    Included among the second set of items were two barrels of waste fluid, which Franklin identified as liquid waste from Hy-Mark's wash lines, and approximately forty cans of paint which Franklin testified were used to paint Hy-Mark's machinery and to paint the cylinders it made.    Trial Tr. 53, 114-15.    Franklin testified to spending "30 some thousand" for the "removal of [these and other items of] hazardous waste and cleaning the floors" in mid to late 2011.    Trial Tr. 53-54 (discussing oily floor residue left by Worthington), 73-74, 113, 117; Pl. Ex. 9.1, 9.2. Although Franklin testified that Eastern Management Company paid for this expense, plaintiffs offered no documentary evidence, such as invoices or canceled checks, documenting such expense or other records showing how much of the reported $30,000.00 was spent to dispose of the paint cans and two barrels of wash waste.[15]    Trial Tr. 118-21.

### G.    Rental of and Sale of the Premises (Count Five)

43.    After entering into the contract and following the removal of Hy-Mark's assets from the premises, 56th Street leased portions of the premises to several renters who used the premises as a warehouse facility.    First, and within the 10 month, 27 day period specified for asset removal, 56th Street leased approximately 35,000 square feet of the premises to Wal-Mart Stores East for $34,041.00 for the period from March 4, 2011 to May 13, 2011.    Pl. Ex. 23.    From May 2012 through May 2013, 56th Street leased approximately 27,500 square feet of the premises to

---

[15]  Plaintiff's exhibit 2 contained Gary Hewitt's December 8, 2011 estimate of $31,790.46 for the disposal and "various clean up assignments" at the premises.    Mr. Hewitt, however, testified that he did not perform this work.    Trial Tr. 181.

22

Kamco Building Supply Corporation for approximately $9,052.00 per month.  *Id.*  The parties then extended this lease for the month of June 2013 for approximately $10,052.00.  *Id.*  Finally, 56th Street leased a portion of the premises to S & V Warehousing and Trucking Services beginning June 16, 2014 on a month-to-month basis for $3,750.00 per month plus utilities and taxes applicable to the leased premises.  *Id.*

**H.      Cost of Estimate (Count Six)**

44.      In count six of the complaint, plaintiffs seek reimbursement of $3,700.00 allegedly expended to obtain a repair estimate from Gary Hewitt.  Trial Tr. 12-44.  This estimate, plaintiffs' exhibit 2, was received into evidence and primarily addressed the materials, labor, and cost of replacing the electrical systems at the premises.  Plaintiffs offered no testimony or other evidence concerning the cost of, or payments made for, the estimate.

### III.      CONCLUSIONS OF LAW

**A.   Jurisdiction**

1.      The Court has subject matter jurisdiction in accordance with 28 U.S.C. § 1332, which gives the district courts "original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000" and is between "citizens of different States." Here, it is undisputed that the amount in controversy exceeds $75,000.00 and complete diversity exists between plaintiffs and defendant Worthington.

**B.   Causes of Action**

2.      The conclusions of law discussed below will address only plaintiffs' breach of contract claims.  Although plaintiffs' second amended complaint alleges both breach of contract claims and tort claims, the Court finds that plaintiffs' tort claims must fail.

23

3.      As discussed in the Court's earlier order granting Worthington's partial motion to dismiss plaintiffs' claim for punitive damages, ECF No. 14, a party pursuing a tort claim associated with a breach of contract claim must allege a breach of a duty separate from that "existing between the parties solely by virtue of the contract."   *Foreign Mission Bd. of Southern Baptist Convention v. Wade*, 242 Va. 234, 241 (1991); *see Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 256 Va. 553, 558 (1998) ("A tort action cannot be based solely on a negligent breach of contract.").   In the present case, plaintiffs allege that Worthington negligently damaged the building, removed equipment, and failed to properly clean the premises.   ECF No. 24 at ¶¶ 12, 18, 20, 27, 35.   These claims, however, rest upon the premise that Worthington negligently performed or failed to perform its contractual duties.   Accordingly, the Court finds that plaintiffs' tort claims are not actionable.

## C.   Breach of Contract

4.      Ohio law applies to plaintiffs' breach of contract claims pursuant to the provision in the contract specifying that the agreement "shall be governed in all respects, including validity, interpretation and effect, by the internal laws of the State of Ohio."   This provision governs in accordance with the rule that "where the parties to a contract have expressly declared that the agreement shall be construed as made with reference to the law of a particular jurisdiction, [the courts] will recognize and enforce it, applying the law of the stipulated jurisdiction."   *Saliba v. Exxon Corp.*, 865 F. Supp. 306, 310 (W.D. Va. 1994) (citing *Paul Bus. Sys., Inc. v. Canon U.S.A., Inc.*, 397 S.E.2d 804, 807 (Va. 1990)).

5.      To interpret a contract, the Court must "give effect to the intent of the parties," which involves examining the contract as a whole and presuming "that the intent of the parties is

24

reflected in the language of the contract." *Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 953 N.E.2d 285, 292 (Ohio 2011). The Court must look to the "plain and ordinary meaning of the language used in the contact." *Id.* If the language is clear, "a Court may look no further than the writing itself to find the intent of the parties."[16] *Id.*

6.     "[A] breach of contract occurs when a party demonstrates the existence of a binding contract or agreement; the nonbreaching party performed its contractual obligations; the other party failed to fulfill its contractual obligations without legal excuse; and the nonbreaching party suffered damages as a result of the breach." *Lawrence v. Lorain Cty. Cmty. Coll.*, 713 N.E.2d 478, 480 (Ohio Ct. App. 1998) (citing *Garofalo v. Chicago Title Ins. Co.*, 661 N.E.2d 218, 226 (Ohio Ct. App. 1995)).

7.     Damages for a breach of contract are defined as "those which are the natural and probable consequence of the breach of contract or damages resulting from the breach that were within the contemplation of both parties at the time of making the contract." *Eckel v. Bowling Green State Univ.*, 974 N.E.2d 754, 768 (Ohio Ct. App. 2012). Breach of contract damages are intended to return the injured party to the same position it would have been in, absent the breach. *Id.* Thus, the Court must measure damages based upon the amount that will make the injured party whole. *Landis v. William Fannin Builders, Inc.*, 951 N.E.2d 1078, 1089 (Ohio Ct. App. 2011). While this amount need not be calculated with "mathematical certainty," it cannot "be based on mere speculation and conjecture." *Eckel*, 974 N.E.2d at 768. Accordingly, plaintiffs must prove damages "in an amount ascertainable with reasonable certainty." *Id.*

---

[16] In the present case, neither party asserts that the contract is ambiguous, but both parties dispute how any ambiguity should be interpreted by the Court. ECF Nos. 61 at 23-24, 62 at 12. Because the Court does not find that the contract is ambiguous, the Court will not address such dispute in the conclusions of law.

**D.    Counts One and Five – Wiring and Electrical Systems and Rental and Sale of the Premises**

8.    Plaintiffs contend that Worthington breached the contract by removing electrical systems constituting part of the building and improvements to the premises, thereby causing unnecessary damage to the premises.[17]    *See* Pl. Ex. 1 at ¶¶ 1.1.2(b), 7.11.1(c).    Due to this alleged breach, plaintiffs ask the Court to award damages for the cost of replacing the electrical systems (count one) and for loss of rental income (count five).    As detailed in the findings of fact above, the Court found that, upon the onset of the work, the parties orally modified the contract to address the issue of how to disconnect the machinery from the electrical systems on site.    Further, the Court found that Worthington removed electrical systems in a manner consistent with the oral agreement between McKinley and Franklin.    Accordingly, the Court must now determine (1) whether this agreement constitutes a valid oral modification of the contract and (2) whether plaintiffs may recover damages, in the form of replacement costs or lost rent, for Worthington's removal of electrical systems from the building.[18]

---

[17] Plaintiffs also suggest that the electrical systems constituted fixtures, an assertion that the Court notes does not support plaintiffs' position that Worthington breached the contract by removing electrical systems because the contract lists all "fixtures" as part of the purchased assets.    ECF No. 61 at 18-19; Pl. Ex. 1 at ¶ 1.1.1.

[18] Notwithstanding the contract's specification that Worthington was "[to] repair and be responsible for any damage caused by [Worthington] *or its agents*," Pl. Ex. 1 at ¶ 7.11.1(c)(emphasis added), Worthington asserts that, if a breach of contract occurred in removing electrical systems, the responsibility therefor rests with Doral, an independent contractor.    The Court rejects this argument for both legal and factual grounds.    Ohio law dictates that the "chief test in determining whether one is an employee or an independent contractor is the right to control the manner or means of performing the work."    *Pusey v. Bator*, 762 N.E.2d 968, 972 (Ohio 2002) (citations omitted).    The Court finds that Doral was not an independent contractor of Worthington.    The Court bases this finding, in part, on Scott Anson's testimony that Jody McKinley directed him to remove wiring to "the safest point."    Trial Tr. 233-34.    Anson also testified that both he and McKinley directed the work of Doral employees in removing

26

*i. No Oral Modification Clause*

9.      The agreement between Franklin and McKinley (indicating that electrical systems should be removed back to the nearest, safest disconnect) constitutes a valid oral modification of the contract, notwithstanding the contract's proviso that it may not be "amended or modified except by written instrument duly executed by each of the parties hereto."   Pl. Ex. 1 at ¶ 10.2.

10.      Ohio case law dictates that oral contract modifications may be valid, notwithstanding a no oral modification clause, when certain circumstances exist.   A party asserting the existence of an oral modification must set forth more than a "bald statement" that "an oral modification of another contractual term was reached."   *Wells Fargo Bank, NA v. Smith*, No. 2010-T-0051, 2012 WL 1288494, at *8 (Ohio Ct. App. Apr. 16, 2012).   The asserting party must introduce "evidence of a subsequent act of the 'opposing' party which treats the modification as operative," which may be established "through an admission by the opposing party, a stipulation by both parties, or the opposing party's conduct after the fact."   *Id.* at 8.   *See also*, *RotoSolutions, Inc. v. Crane Plastics Siding LLC*, Nos. 13AP-1, 13AP-52, 2013 WL 5451702, at *3 (Ohio Ct. App. Sept. 30, 2013) ("[A]n oral modification of a written contract can be enforceable notwithstanding a provision in the contract requiring modifications to be in writing where . . . the parties have engaged in a course of conduct in conformance with the oral modification and where

---

electrical systems.   Trial Tr. 249-50.   Additionally, the evidence established that Worthington employees participated in the removal of the electrical systems.   In this regard, McKinley testified that he relied on Worthington employees, Paul Kennedy and Jeff Reese, to determine the point from which wiring could be safely removed.   Trial Tr. 222, 362-63.   McKinley also testified that he would make decisions with Kennedy, Reese, Anson, and Hight regarding the points from which electrical systems could be safely removed.   Trial Tr. 222-23.   Because Worthington employees both participated in and controlled the manner by which Doral removed electrical systems, the Court rejects Worthington's attempt to shift liability and classify Doral as an independent contractor.

the party seeking to enforce the oral modification would suffer injury if the modification were deemed invalid."); *Fields Excavating, Inc. v. McWane, Inc.*, No. CA2008-12-114, 2009 WL 3721013, at *7 (Ohio Ct. App. Nov. 9, 2009) ("Provisions preventing oral modification are waived if: 1) an oral modification is acted upon by the parties; and 2) refusal to enforce the oral modification would result in fraud or injury to the promisee, [that is] detrimental reliance."). From a policy perspective, this rule reaches a balance "between the enforcement of the basic purpose of the clause [to protect a party against fraudulent or mistaken oral testimony] and the concern that a party could agree to both the oral waiver and modification, and then hide behind the no oral modification clause in order to avoid enforcement." *Wells Fargo Bank*, 2012 WL 1288494, at *8.

11.   In this case, Franklin's actions, subsequent to the oral modification claimed by Worthington, enable the Court to deem the modification as operative.   In particular, Worthington has introduced evidence that Franklin nodded and said "okay" in response to McKinley's proposal to remove electrical systems to the nearest, safest disconnect.   Trial Tr. 314.   Thereafter, the work proceeded in accordance with this agreement over an extended period of time while Franklin was present in the building for at least part of the time.   During this time, Franklin made no substantial, contemporaneous complaints about the manner of the ongoing work.   Remarkably, neither during nor immediately after the completion of the work is there any written record of complaints by Franklin to Worthington regarding the electrical systems at the premises.   Instead of taking action, Franklin waited until November 2011 before seeking an estimate to replace <u>all</u> of the removed electrical systems[19] and conceded that he did not "have a good answer" and "didn't

---

[19]  In this regard, it bears noting that the electrical repair estimate supplied by Gary Hewitt was

know why he waited that long."   Trial Tr. 123.   Because Franklin's actions establish a course of conduct in conformance with the agreement reached by Franklin and McKinley (designating that Worthington remove the electrical systems to the nearest, safest disconnect) and refusal to enforce this agreement would result in injury to Worthington, the Court rules that the agreement reached by McKinley and Franklin was a valid and enforceable oral modification of the contract.

12.     Because, as noted above, the manner by which Worthington removed the electrical systems corresponded to the agreement reached by McKinley and Franklin, Worthington did not breach the contract by removing electrical systems from the building.[20]

---

built around the concept of reinstalling electrical systems throughout the premises *and to each of the dozens of now removed pieces of manufacturing equipment sold to Worthington*.  Pl. Ex. 2. "Re-wiring" the building in this manner appears to serve no real purpose.  Pl. Ex. 26A at 58 (absence of equipment meant that there was nothing to connect the wires to), 81.  When asked by the Court if he could identify what portion of his estimate could be attributed to ensuring the building had sufficient wiring to operate as a manufacturing facility, Hewitt was unable to answer the question, other than to state that "[w]hat I was asked to do was to try to put it back the best I could like it was . . . ."  Trial Tr. 180-81.

[20]  In the absence of such an agreement, however, the Court also finds, consistent with testimony about how electrical systems at the premises were added during the installation of new pieces of machinery by Hy-Mark, that at least a significant portion of the removed electrical systems were also part of the purchased assets and fixtures and were used, directly or indirectly, in the conduct of Hy-Mark's business.  *See, e.g.,* Pl. Ex. 26A at 41-44, 46-47; Pl. Ex. 19; Trial Tr. 195-99. Although it is possible that some lesser portion of the items removed constituted improvements to the building, plaintiffs have not offered sufficient proof, such as detailed pre- and post-removal comparisons and/or comprehensive expert testimony, to enable the Court to draw such distinctions without engaging in speculation about both the existence of a breach and any damages resulting therefrom.  Trial Tr. 394.  In the absence of better proof from plaintiffs about the pre-existing electrical systems and the extent, if any, of their association with each or, at a minimum, the primary pieces of machinery on the premises, the Court is unable to find by a preponderance of the evidence that Worthington violated either the post-contractual arrangement regarding disconnection of machinery or the underlying contract prohibiting the removal of improvements to the premises.

*ii. Statute of Frauds*

13.     In their post-trial brief, plaintiffs suggest that any oral modification reached by McKinley and Franklin is unenforceable due to the Statute of Frauds.[21]   The Court rejects this argument and finds that the contract is not subject to the Statute of Frauds.

14.     In Ohio, the Statute of Frauds dictates that "[n]o lease, estate, or interest, either of freehold or term of years, or any uncertain interest of, in, or out of lands, tenements, or hereditaments, shall be assigned or granted except by deed, or note in writing, signed by the party assigning or granting it, or his agent thereunto lawfully authorized, by writing, or by act and operation of law."   Ohio Rev. Code Ann. § 1335.04 (West 2015).   Accordingly, any "subsequent oral agreement modifying an 'essential' or 'material' term of a written contract required to be in writing by the Statute of Frauds is invalid and unenforceable."   *Bahner's Auto Parts v. Bahner*, No. 97CA2538, 1998 WL 470494, at *9 (Ohio Ct. App. July 23, 1998).   In Ohio, leases must be in writing under the Statute of Frauds.   *Schloss v. Sachs*, 631 N.E.2d 212, 214 (Ohio Mun. Ct. 1993). If, however, an agreement constitutes a license rather than a lease, the Statute of Frauds does not

---

[21] Specifically, plaintiffs argue that the parol evidence rule bars enforcement of any post-contract oral modification.   ECF No. 61 at 21-22.   In doing so, however, plaintiffs quote and apply the Ohio Statute of Frauds, rather than the parol evidence rule.   *Id.*   Therefore, the Court will treat plaintiffs' argument as one based on the Statute of Frauds.   Even so, the Court separately notes that the parol evidence rule does not apply to the present case because the oral modification at issue occurred after the contract was expressed in writing.   In Ohio, the parol evidence rule provides that "'absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior contemporaneous oral agreements, or prior written agreements.'"   *Williams v. Spitzer Autoworld Canton, L.L.C.*, 913 N.E.2d 410, 415 (Ohio 2009) (quoting *Galmish v. Cicchini*, 734 N.E.2d 782 (Ohio 2000)).   Accordingly, this rule excludes extrinsic evidence of events that occurred before or contemporaneous to the expression of the contract in writing.   Because "separate promises made after the [contract] are not prevented by the parol evidence rule," the Court finds that such doctrine has no application to the present case.   *Viking & Worthington Steel Enter., L.L.C. v. James*, No. 2010-G-2971, 2011 WL 1345131, at *6 (Ohio Ct. App. Apr. 8, 2011).

apply.   The Ohio Supreme Court has explained the difference between a license and a lease by noting that "[a] license to do an act upon land involves the exclusive occupation of the land by the licensee so far as is necessary to do the act and no further, whereas a lease gives the right of possession of the land and the exclusive occupation of it for all purposes not prohibited by its terms."   *Di Renzo v. Cavalier*, 135 N.E.2d 394, 394 (Ohio 1956).   Thus, "the essential feature distinguishing a lease of an interest in land from such other conveyances as licenses, easements and profits, is the fact of *exclusive possession for a determinable term of years*—the right to physical control to the exclusion of others."   *Cuvier Press Club v. Fourth & Race St. Assoc.*, 439 N.E.2d 443, 447-48 (Ohio Ct. App. 1981) (emphasis in original).   Ohio case law has also identified the elements of a lease as follows:   "(1) a defined space or place, however small, which the lessor occupies, (2) to the exclusion of others, and (3) that the use of the space or place is not merely incidental to the performance of the contract."   *Schloss*, 631 N.E.2d at 216.

15.   The contract at issue here specifies that "the equipment, supplies and other Purchased Assets may remain in the Business Property for 10 months and 27 days after the Closing Date" while Worthington paid "$18,000 per month, for each of the full 10 months, and $16,000 for the final 27 days."   Pl. Ex. 1 at ¶ 7.11.1(a) (entitled "Use of Business Property").   Although plaintiffs suggest that this language gives rise to a lease agreement, the Court finds that the Statute of Frauds does not apply to the contract for the following reasons.   First, the arrangement is not a lease because Worthington's right to access the building was incident to the performance of the contract.   Stated another way, Worthington contracted to access the premises for the time period in question to facilitate the removal of the purchased assets, rather than acquiring a leasehold interest in the property.   *See* Pl. Ex. 1 at ¶ 7.11.2 (noting that Hy-Mark and Franklin would

provide Worthington "full access to the Business Property to remove the Purchased Assets"). Second, Worthington did not have exclusive possession of the premises during these 10 months and 27 days.[22]   While Worthington removed the purchased assets, Franklin kept his office in the building, which he continued to use during this time.   Trial Tr. 36, 102-03, 110.   Franklin also testified that, in the time frame during which Worthington removed machinery, Franklin's bookkeeper was present for about a month in a lower office in the building.   Trial Tr. 111. Beginning in March 2011, 56th Street began leasing a portion of the premises (35,000 square feet) to Wal-Mart, as well.   Pl. Ex. 23.   Also, the contract itself indicates that plaintiffs retained control of the premises by specifying that plaintiffs had the obligation to "make its facilities available to the Removal Party" and "permit the Removal Party and Purchaser to use such of its utilities and equipment as the Removal Party may reasonably request."   Pl. Ex. 7.11.1(b).   Because Worthington did not have exclusive possession of the premises, the contract was not a lease agreement. Accordingly, the contract is not subject to the Statute of Frauds and the oral modification discussed above need not have been in writing.

*iii. Damages*

16.     Even if plaintiffs had proven that Worthington breached the contract by removing electrical systems from the building, they also have failed to establish damages resulting therefrom.[23]

---

[22] In fact, Worthington completed the asset removal in much less time and was last at the premises, after roughly six months, in or about December 2010.   Trial Tr. 236-37, 244, 328-39; Pl. Ex. 20.

[23] Plaintiffs' suggestion that they have established damages, in part, because Worthington did not present contrary damages evidence is without merit. *See Smith v. Allio*, No. 2009-CA-314, 2010 WL 4817336, at *3 (Ohio Ct. App. Nov. 22, 2010) ("The party seeking damages in a breach of contract action bears the burden of proving the nature and extent of his or her damages in order to

17.     Ohio law specifies that damages for injury to real property that may be restored must be based on "the reasonable cost of restoration, plus the reasonable value of the loss of the use of the property between the time of the injury and the restoration, unless such cost of restoration exceeds the difference in the market value of the property as a whole before and after the injury, in which case the difference in the market value before and after the injury becomes the measure." *Wolff v. Bishop*, No. 13744, 1989 WL 7440, at *1 (Ohio Ct. App. Jan. 25, 1989). However, where restoration is impracticable, "the measure of damages is the difference between the reasonable fair market value before and after the damage." *Stackhouse v. Logangate Prop. Mgmt.*, 872 N.E.2d 1294, 1305 (Ohio Ct. App. 2007).   Where a party has "elected to sell the realty and thus incurred no costs for restoration, only the diminution in value can be claimed as damages." *Wolff*, 1989 WL 7440, at *2.   This rule exists to prohibit parties from claiming "costs to repair realty that they have sold at a profit without having made the repairs."   *Id.*

18.     In the present case, plaintiffs sold the building without making most, if any, of the electrical repairs suggested in Hewitt's estimate.   While Franklin offered testimony that he spent "[$]5,000 or less" on electrical repairs, plaintiffs submitted no documentation for this expenditure. Trial Tr. 112-33.   Furthermore, Hewitt testified that he never performed any of the electrical work listed on his estimate.   Trial Tr. 176-77.   Even if plaintiffs had established liability, the lack of evidence substantiating the unspecified sum that Franklin allegedly spent on electrical repairs makes an award of damages speculative and untenable.

19.     Further, due to the sale of the building, any restoration of the electrical systems it contained is now impracticable.   Accordingly, assuming a breach of contract occurred, the

be entitled to compensation."),

33

primary measure of plaintiffs' damages would be the difference between the reasonable fair market value of the premises before and after the damage.   For the reasons described in section I, A-C above, including plaintiffs' failure to disclose the sale, their failure to provide appropriate and timely expert disclosures about any alleged diminution in market value of the premises, and in light of the damage theory alleged in the second amended complaint, the Court precluded plaintiffs from offering such undisclosed testimony at trial.[24]   Trial Tr. 269-78.   Therefore, the Court finds that plaintiffs may not recover those damages.

20.   Similarly, the Court rules that plaintiffs may not recover damages for lost rent because they have not offered proof sufficient to establish loss in rental value caused by the removal of electrical systems.   Plaintiffs contend that, due to the missing electrical systems, they had to lease the building as a warehouse space for a lesser amount, rather than as a manufacturing space.   However, plaintiffs' proof is insufficient to establish the loss of rent due to removal of electrical systems.   Plaintiffs' second amended complaint estimates lost rental income of "at least $250,000."   ECF No. 24 at ¶ 41.   However, it is unclear how plaintiffs arrived at this sum, and the evidence plaintiffs presented at trial does little to clarify.   At trial, plaintiffs presented the testimony of Thomas Waltz, who explained that, while manufacturing space could be rented from

---

[24] In their post-trial briefs, plaintiffs allege that the Court improperly prohibited Franklin from testifying about the value of the building.   ECF No. 61 at 28-29.   However, Franklin was not asked this question at trial.   Counsel told the Court that he wished to ask Franklin two questions that "would establish the value of the building," but the subsequent questions did not establish this fact.   Trial Tr. 93.   Instead, Franklin testified to the price at which he leased warehouse space ($5.00 per square foot) compared to the price at which he leased manufacturing space ($7.00 per square foot) and answered affirmatively when asked whether the "lease rate reflect[s] the value of the property."   Trial Tr. 93-94.   Contrary to plaintiffs' assertions, the Court did not prohibit Franklin from testifying to the value of the building, but rather he was not asked to value the building at trial.

$6.75 to $7.50 per square foot, warehouse space could only be rented for a lesser sum of $4.00 to $5.00 per square foot.[25]   Trial Tr. 268.   Waltz, however, also testified that many factors go into the calculation of a rental rate, including accessibility, operating expenses of the property, and condition of the premises.   Trial Tr. 279-80.

21.     Moreover, even if plaintiffs had, in fact, proven that they actually could have obtained $2.00 to $3.00 more per square foot by leasing the building as a manufacturing space, the record establishes that plaintiffs made no substantial attempt to replace some or all of the electrical systems before attempting to re-lease the premises.   In every contract, the injured party has a duty to mitigate damages and cannot recover damages that could have been reasonably avoided.   *Lucky Discount Lumber Co. v. Machine Tools of Am.*, 907 N.E.2d 1222, 1224 (Ohio Ct. App. 2009). While this rule "does not require a party to make extraordinary efforts, or to do what is unreasonable or impracticable," it does require a party to use "reasonable care, diligence and prudence." *Id.*   The Court finds that it would not have been unreasonable or impracticable for plaintiffs to have repaired at least some of the electrical systems in the building.   Indeed, Thomas Waltz agreed that, if plaintiffs had restored 2000 amp service and run power to a "few general locations around the building," he would have been able to market the premises as a manufacturing facility.   Trial Tr. 279.   Because no evidence exists that they did so, the Court finds that plaintiffs failed to mitigate damages with respect to lost rent.   Accordingly, even if plaintiffs had established a breach of contract, plaintiffs' failure of proof and failure to mitigate damages precludes recovery of damages for lost rent.

---

[25] Leases submitted by plaintiffs into evidence for rental of the premises after the asset removal reflected rentals at rates far below either of these two ranges.   Pl. Ex. 23.   Waltz, in fact, agreed that the rental market at that time was "soft."   Trial Tr. 280.

### E.   Count Two – Miscellaneous Repairs

22.     Plaintiffs have not proven that Worthington breached the contract by damaging the roof of the building.   If plaintiffs had shown that Worthington's removal of Hy-Mark assets damaged the roof, this might constitute breach of the contract provision requiring that Worthington "leave the Building in the condition it was in prior to the equipment removal."   Pl. Ex. 1 at ¶ 7.11.1(c).   Plaintiffs, however, did not introduce evidence showing that Worthington's actions damaged the roof.   To the contrary, Hewitt's roof repair estimate, one of the few pieces of evidence plaintiffs introduced to substantiate their roof repair claim, appears to detail the cost of repairing "roof penetrations" that apparently existed prior to the asset purchase agreement.   Pl. Ex. 2.   Because the contract did not require Worthington to restore "the Building to the condition it was prior to the installation of the equipment or for correcting conditions" not caused by Worthington, Pl. Ex. 1 at ¶ 7.11.1(c), plaintiffs have failed to establish a breach of contract in this regard.

23.     Additionally, plaintiffs have not proven that Worthington breached the contract by damaging concrete block walls or an exterior wall panel.   With respect to the former, the evidence showed that Worthington or its agents damaged concrete block walls during asset removal, but also repaired the walls, consistent with the contract, prior to departing the premises.   Franklin's testimony that he or one of his companies spent a "couple thousand" to repair damage to the same or different concrete block walls, Trial Tr. 113, is unsubstantiated and at odds with the photographic and testimonial evidence discussed in the findings of fact.   With respect to the exterior wall panel, Franklin's testimony did not identify an amount spent on repairs and plaintiffs failed to submit documentary proof of payment for any such repairs.   In the absence of such

evidence, the Court finds plaintiffs have failed to prove damages related to concrete block wall repair or exterior wall panel repair.

**F.   Count Three – Fire Suppression Equipment**

24.     Eric Hight's removal of fire extinguishers and other unspecified fire suppression equipment arguably constituted a breach of contract because he, while acting on Worthington's behalf, caused the removal of assets not belonging to Hy-Mark, which left the building in a condition other than "it was prior to the equipment removal" called for by the contract.   Pl. Ex. 1 at ¶ 7.11.1(c).

25.     Assuming that Hight's actions with respect to the fire equipment constituted a breach, plaintiffs' claim still fails because they cannot prove damages arising from the alleged breach.   *See EFA Assoc., Inc. v. Dep't of Admin. Serv.*, 2002 WL 1013052, at *5 (Ohio Ct. App. May 21, 2002) ("Damages are an essential part of a breach of contract claim, and without them plaintiff cannot maintain a claim for breach of contract.); *Dulaney v. Jallaq*, 1998 WL 869706, at *2 (Ohio Ct. App. Dec. 8, 1998) (holding that plaintiff's breach of contract claims were moot because she failed to prove damages).   As discussed in the findings of fact, plaintiffs did not submit any evidence that they incurred costs due to the removal of fire equipment from the building.   Because the Court may not award damages based on "mere speculation and conjecture," plaintiffs' claim must fail.   *Eckel*, 974 N.E.2d at 768.

**G.   Count Four – Building Cleanup and Removal of Assorted Materials**

26.     The Court finds that Worthington breached the contract by failing to remove all of Hy-Mark's assets from the building, including the two barrels of waste fluid and paint cans identified by Franklin.   The contract specifies that the purchased assets included all "machinery,

equipment, tools, dies, furniture, furnishings, fixtures, goods and other tangible personal property," as well as all "inventory including without limitation finished products, work in process, parts, components, products under research and development, raw materials, packaging materials, labels, office and other supplies, merchandise and other inventories."   Pl. Ex. 1 at ¶ 1.1.1.   Franklin testified that the barrels of liquid waste and paint cans left in the building were Hy-Mark assets that Worthington purchased under the terms of the contract.   Trial Tr. 53-54, 114-15.   In light of Franklin's testimony and the extensive list of purchased assets listed in the contract, the Court finds that such items constituted purchased assets.   Furthermore, the Court finds that no oral modification of the contract existed with respect to the removal of these items from the building.   McKinley's testimony that he told plaintiffs that they were responsible for the disposition of hazardous materials unrelated to the manufacturing process while Worthington was responsible for disposition of hazardous materials related to the manufacturing process does not establish an oral modification of the contract because there is no evidence that plaintiffs actually agreed to McKinley's proposal for the disposition of hazardous materials.   Trial Tr. 316. Furthermore, the Court does not find the existence of a subsequent course of conduct demonstrating that an oral modification was reached with respect to the removal of hazardous materials.   Without a valid oral modification of the contract, the Court finds that Worthington breached the contract by leaving waste barrels and paint cans in the building.   Beyond that, however, plaintiffs have failed to establish what remained[26] and whether any remaining chemicals and hazardous materials were assets of Hy-Mark or were owned by the 56th Street, the owner of

---

[26]  For example, it is disputed whether certain five gallon drums and a cabinet containing assorted chemicals were removed by Worthington or remained at the premises.   *Compare* Trial Tr. 324-25 *with* Pl. Ex. 2.

the premises.

27.     Even so, plaintiffs failed to prove damages for this breach.  As discussed in the findings of fact, plaintiffs submitted no evidence to substantiate their expenditures, besides Franklin's testimony that he spent "30 some thousand" to remove hazardous waste and clean the floors.  Trial Tr. 113.   When the Court inquired of plaintiffs' counsel if they had evidence documenting that such work was performed and paid, counsel conceded that plaintiffs' exhibits contained no such items and then stated that "[w]e are relying on the Hewitt estimate . . . ."  Trial Tr. 117-19.   Although Hewitt estimated in December 2011 a cost of $31,790.46 for disposing of assorted hazardous and other materials, Pl. Ex. 2, he also testified that he did not perform such tasks.   Trial Tr. 147, 181.   Plaintiffs' failure to submit documentary evidence or testimony about the specific amounts expended, including the sum attributable to removal of the two barrels of wash waste and 40 cans of paint, renders the Court unable to calculate damages with any degree of reasonable certainty.   *See Dulaney v. Jallaq*, 1998 WL 869706, at *2 (holding that plaintiff's breach of contract claims were moot because she failed to prove damages).   Accordingly, the Court will not award damages associated with building cleanup and removal of assorted materials.

## H.   Count Six – Estimate

28.     In their second amended complaint, plaintiffs allege that, because of Worthington's breach of the contract, they expended $3,700.00 to obtain a repair estimate from Gary Hewitt to fix the building.   ECF No. 24 at ¶ 44.   As discussed above, the Court has found that Worthington breached the contract with respect to some of plaintiffs' counts, but not all.   Namely, the Court ruled that plaintiffs have not established that Worthington breached the contract with respect to electrical systems and miscellaneous repairs.   In view of this determination, inasmuch as the only

repair estimate offered by plaintiffs primarily addressed the cost of installing new electrical systems, defendants have no liability for the cost of obtaining that estimate.

29.     Furthermore, plaintiffs failed to prove damages with respect to the estimate. Plaintiffs submitted no documentary evidence that they paid Hewitt, or anyone else, to prepare the estimate and Franklin did not testify at trial that he paid for the estimate.   Thus, the Court cannot calculate or award damages.

## IV.     CONCLUSION

For the reasons stated above, the Court concludes that plaintiffs have failed to establish a breach of contract and/or failed to establish damages resulting from any such breach. Accordingly, JUDGMENT IS AWARDED FOR DEFENDANT.

Furthermore, defendant's motion for summary judgment, ECF No. 55, is DISMISSED AS MOOT.

The Clerk is directed to send a copy of this memorandum opinion and order to counsel of record for plaintiffs and the defendant.

IT IS SO ORDERED.


_____
                    /s/
                Robert J. Krask
            United States Magistrate Judge


Norfolk, Virginia
March 7, 2016


40